IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | | |
|---|---|---|
| Rhonda Meisner, | ) | C/A No. 3:12-684-CMC-PJG |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| ZymoGenetics, Inc., *a wholly owned* | ) | |
| *subsidiary of Bristol-Myers Squibb*; | ) | |
| ZymoGenetics, LLC, *a wholly owned* | ) | |
| *subsidiary of ZymoGenetics, Inc.*; Tracey | ) | |
| Calderazzo, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

The plaintiff, Rhonda Meisner ("Meisner"), who commenced this action with counsel but

is now proceeding *pro se*, alleges discrimination and retaliation pursuant to Title VII of the Civil

Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e, et seq.,[1] violation of the South Carolina

Payment of Wages Act, S.C. Code Ann. § 41-10-10, et seq., and slander. This matter is before the

court pursuant to 28 U.S.C. § 636(b) and Local Civil Rule 73.02(B)(2) DSC for a Report and

Recommendation on Meisner's motion for summary judgment on her wage claim (ECF Nos. 134,

171), to which the defendants responded (ECF No. 154) and Meisner replied (ECF No. 158). Also

before the court is the defendants' motion for summary judgment as to all claims. (ECF No. 216.)

Pursuant to Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975), the court advised Meisner of the

---

[1] Specifically, Meisner alleges gender, age, and religious discrimination in violation of Title VII; however, because age is not a protected characteristic under Title VII, the defendants and the court have construed this portion of her Title VII claim as a discrimination claim under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621, et seq. See 42 U.S.C. § 2000e-2(a)(1) (stating that Title VII prohibits an employer from "discharg[ing] any individual, or otherwise . . . discriminat[ing] against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin").

summary judgment and dismissal procedures and the possible consequences if she failed to respond adequately to the defendants' motion. (ECF No. 217.) Meisner filed a response in opposition (ECF Nos. 228 & 249), the defendants replied (ECF No. 239), and with leave of court Meisner filed a sur-reply (ECF Nos. 246 & 250).[2] Having reviewed the parties' submissions and the applicable law, the court finds that Meisner's motion for summary judgment should be denied and the defendants' motion for summary judgment should be granted.

## BACKGROUND

The following facts are either undisputed or are viewed in the light most favorable to the non-moving party, to the extent they find support in the record. Meisner, a female over the age of forty, worked for Defendant ZymoGenetics[3] from August 2007 until her termination in July 2012, which became effective in August 2012. ZymoGenetics is a biotechnology company that developed a recombinant, plasma-free thrombin pharmaceutical called Recothrom, which is used by physicians to help stop a patient from bleeding when standard surgical techniques are ineffective or impractical. Recothrom was approved for sale by the Food and Drug Administration on January 17, 2008. Meisner was hired by ZymoGenetics as a surgical sales manager (SSM) within the Sales and Marketing Department for the Columbia, South Carolina territory,[4] and at the time of her hire reported to Valerie Darling, the regional business director (RBD) for the Southeast Region, who

_____

[2] Meisner has also moved to amend her sur-reply to attach an additional deposition excerpt. (ECF No. 252.) Because the excerpt she seeks to include is already in the record, the court denies the motion as moot.

[3] The court collectively refers to ZymoGenetics, Inc. and ZymoGenetics, LLC as "ZymoGenetics."

[4] The parties agree that Meisner did not manage other employees, but rather managed her territory, which spanned from Columbia, South Carolina to the South Carolina coast and as well included Savannah and Augusta, Georgia.



reported to Mike Dwyer, the Senior Vice President of Sales and Marketing. Dwyer was replaced by Steve Owens in March 2009. Darling's employment ended in March 2009 and Owens supervised the Southeast region until Jeff Fortino became the regional business director for the Southeast region in October 2009. Fortino then supervised Meisner until her termination. During Meisner's employment with ZymoGenetics, the assigned medical science liaison (MSL) for her territory was Defendant Tracey Calderazzo.

According to Owens, the focus of the Sales and Marketing Department was selling Recothrom by building relationships with key personnel in hospitals and other medical units, while the medical science liaisons were in the Medical Affairs Department and they focused on educating physicians, pharmacists, and other healthcare professionals in the science behind Recothrom and providing scientific expertise regarding Recothrom. (Owens Decl. ¶¶ 4-5, ECF No. 216-3 at 2-3; see also ZymoGenetics's Surgical Sales Manager Job Description, ECF No. 216-11 at 2.)

Meisner's Amended Complaint alleges that under Darling she received positive performance reviews and a salary increase and that following Darling's termination in 2009, Meisner applied for and was denied Darling's former position of regional business director. This position was awarded to Jeff Fortino, a younger male whom Meisner alleges was less qualified than she. Meisner alleges that while she was under Fortino's supervision he displayed a discriminatory attitude towards her and subjected her to a hostile work environment based on her gender. Meisner also alleges gender and age discrimination in Fortino's completion of a negative performance evaluation for 2009 and for failing to hire her for an open position as a sales representative trainer. Further, Meisner alleges religious discrimination and retaliation in reprimanding and harassing her based on an incident that occurred during a sales conference in Dallas, Texas in 2010. Meisner also alleges that her termination was retaliatory for opposing improper conduct by two males on one account and



discriminatory because she was terminated pursuant to alleged circumstances under which male sales representatives were not. Meisner alleges that she was replaced by a younger, unmarried female who had no children and who formerly worked for a competitor of ZymoGenetics.

Meisner alleges that ZymoGenetics violated the South Carolina Payment of Wages Act in failing to pay her commissions owed from April through July 2010. She also alleges that Defendant Calderazzo made false and defamatory statements about her to third parties.

## DISCUSSION

### A.     Summary Judgment Standard

Summary judgment is appropriate only if the moving party "shows that there is no genuine dispute as to any material fact and the [moving party] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party may support or refute that a material fact is not disputed by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* [dispute] of *material fact*." Ballinger v. N.C. Agric. Extension Serv., 815 F.2d 1001, 1005 (4th Cir. 1987) (emphasis in original) (internal quotation marks & citation omitted). A fact is "material" if proof of its existence or non-existence would affect the disposition of the case under the applicable law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986). An issue of material fact is "genuine" if the evidence offered is such that a reasonable jury might return a verdict for the non-movant. Id. at 257.

In discrimination cases, a party is entitled to summary judgment if no reasonable jury could rule in the non-moving party's favor. Dennis v. Columbia Colleton Med. Ctr., Inc., 290 F.3d 639,



645 (4th Cir. 2002). The court cannot make credibility determinations or weigh the evidence, but the court should examine uncontradicted and unimpeached evidence offered by the moving party. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000). The court must determine whether a party's offered evidence is legally sufficient to support a finding of discrimination and look at the strength of a party's case on its own terms. See id. at 148 (stating that "[c]ertainly there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational fact-finder could conclude that the action was discriminatory"). Further, while the federal court is charged with liberally construing a complaint filed by a *pro se* litigant to allow the development of a potentially meritorious case, see, e.g., Cruz v. Beto, 405 U.S. 319 (1972), the requirement of liberal construction does not mean that the court can ignore a clear failure in the pleadings to allege facts which set forth a federal claim, nor can the court assume the existence of a genuine issue of material fact where none exists. Weller v. Dep't of Soc. Servs., 901 F.2d 387 (4th Cir. 1990).

## B.    Federal Claims

### 1.    Direct Evidence and Burden-Shifting Framework

A plaintiff asserting a claim of unlawful employment discrimination may proceed through two avenues of proof. First, she may establish her claims through direct evidence of the alleged discrimination. See Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F.3d 277, 284-85 (4th Cir. 2004) (*en banc*). Such proof includes "evidence of conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision." Id. (quoting Fuller v. Phipps, 67 F.3d 1137, 1142 (4th Cir. 1995)). "[A] plaintiff must demonstrate that a 'protected trait . . . actually played a role in the employer's decisionmaking process and had

a determinative influence on the outcome.' " Worden v. SunTrust Banks, Inc., 549 F.3d 334, 342 n.7 (4th Cir. 2008) (quoting Hill, 354 F.3d at 286).

Alternatively, when direct evidence is lacking, a plaintiff may produce circumstantial evidence and proceed under the McDonnell Douglas burden-shifting framework. Warch v. Ohio Casualty Ins. Co., 435 F.3d 510, 520 (4th Cir. 2006); see also McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). Pursuant to this framework, once the plaintiff establishes a *prima facie* case of discrimination, the burden shifts to the defendant to produce evidence of a legitimate, nondiscriminatory reason for the adverse action. Merritt v. Old Dominion Freight, 601 F.3d 289, 294 (4th Cir. 2010) (Title VII). The defendant's burden "is a burden of production, not persuasion." Reeves, 530 U.S. at 142. Once a defendant meets this burden by producing affidavits or testimony demonstrating a legitimate, nondiscriminatory reason, "the McDonnell Douglas framework—with its presumptions and burdens—disappear[s], and the sole remaining issue [is] discrimination *vel non*." Id. (internal quotation marks & citations omitted).

In other words, if the defendant meets the burden to demonstrate a legitimate, nondiscriminatory reason, the plaintiff must demonstrate by a preponderance of the evidence that the proffered reason was " 'not its true reason[], but [was] a pretext for discrimination.' " Merritt, 601 F.3d at 294 (quoting Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981)). Accordingly, the plaintiff's burden of demonstrating pretext " 'merges with the ultimate burden of persuading the court that [the plaintiff] has been the victim of intentional discrimination.' " Merritt, 601 F.3d at 294 (quoting Burdine, 450 U.S. at 256) (alterations in original); see also Diamond v. Colonial Life & Accident Ins. Co., 416 F.3d 310, 319 (4th Cir. 2005) (Title VII & 42 U.S.C. § 1981. To meet this "merged" burden, the employee may prove by a preponderance of the

PJG

evidence that the decision maker's affidavit is untrue or that the employer's proffered explanation is unworthy of credence. Burdine, 450 U.S. at 256.

"[A] plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, *may* permit the trier of fact to conclude that the employer unlawfully discriminated." Reeves, 530 U.S. at 148. However, "if the record conclusively reveal[s] some other, nondiscriminatory reason for the employer's decision, or if the plaintiff create[s] only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred," summary judgment is appropriate. Id. Accordingly, the court must evaluate "the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered on a motion for judgment as a matter of law." Id. at 148-49. "Notwithstanding the intricacies of proof schemes, the core of every [discrimination] case remains the same, necessitating resolution of the ultimate question of . . . whether the plaintiff was the victim of intentional discrimination." Merritt, 601 F.3d at 294-95.

### 2.    Meisner's Claims[5]

#### a.    Disparate Treatment—Termination

##### (i)    Direct Evidence

Meisner appears to contend that she has direct evidence that her termination was the result of gender discrimination. Meisner points to a chart of separated surgical sales representatives from

---

[5] As an initial matter, Meisner appears to argue that the defendants' motion for summary judgment should be denied based on her allegations that Fortino's declaration consists of perjured statements and that defendants' counsel has aided and suborned it. The court has reviewed all of Meisner's alleged support for such serious allegations and finds them to be either wholly without merit or a tenuous stretch at best.



January 2007 through February 2010 which Meisner argues demonstrates that one hundred percent of the women were terminated involuntarily during that time period. Review of the chart reveals that six men and six women involuntarily separated from employment during that time period and an additional eight men voluntarily left employment. (ECF No. 249-7.) As further alleged direct evidence of discrimination, Meisner also references an alleged question by Fortino in October 2009 asking her how she found time to work as a mother of four sons; an alleged question by Fortino asking Meisner about a "relationship issue" with Dr. Claus Brandigi with Doctors Hospital; an alleged statement by Fortino to a male surgical sales manager that he was on the telephone with a "cute blonde"; and Fortino's differing treatment of Meisner from similarly situated males in meetings and events, such as informing Paul Schmitt that he was tape recording a conversation but not informing Meisner. (Pl.'s Resp. Opp'n Summ. J. at 8, ECF No. 228 at 8.) Upon review of these incidents, the court finds that it is unclear how many of these comments or this evidence demonstrates a discriminatory attitude. See Hill, 354 F.3d at 284-85. Moreover, even if such could be considered as evidence of gender animus, they are isolated remarks that Meisner has failed to demonstrate relate to any challenged employment practice. Courts in this circuit have widely recognized that stray comments cannot alone constitute evidence of discrimination. See Brinkley v. Harbour Recreation Club, 180 F.3d 598, 608 (4th Cir. 1999) (Title VII) ("[T]o prove discriminatory animus, the derogatory remark cannot be stray or isolated and unless the remarks upon which plaintiff relies were related to the employment decision in question, they cannot be evidence of discrimination.") (internal quotation marks and alterations omitted), overruled on other grounds by Desert Palace, Inc. v. Costa, 539 U.S. 90 (2003). Accordingly, unless connected with

the employment decision at issue, isolated comments cannot constitute evidence of the discriminatory animus necessary to establish a Title VII claim.[6]

Meisner also cites to testimony from Eric Diello, a surgical sales manager on the west coast, describing a "boys' club" culture. However, full review of this testimony in context reveals that Diello further explained that the phrase indicated a culture where employees helped each other out and where certain employees advanced or were hired based on their friendships or relationships rather than their abilities. (Diello Dep. 113-114, ECF No. 228-5 at 34-35.) Moreover, he testified that he definitely did not observe Fortino treat women differently because of their gender and that he did not have any reason to believe that Meisner's complaints about Fortino's management style had anything to do with her gender. (Id. at 113, ECF No. 228-5 at 34.) Additionally, Deillo stated that several men had problems working for Fortino. (Id. at 112-13, ECF No. 228-5 at 33-34.)

To the extent Meisner's arguments may be construed to rely on a corporate culture of gender discrimination, the court finds such an argument unavailing. As stated above, many of the comments upon which she relies do not demonstrate gender discrimination, were stray or isolated, or are taken out of context. The alleged comments and testimony do not demonstrate that "the corporate culture evinced a very specific yet pervasive aversion" to female employees. Cf. Merritt v. Old Dominion Freight Line, Inc., 601 F.3d 289, 301 (4th Cir. 2010) (finding probative a sufficient nexus between the remarks and the employment decision where evidence reflected that "employees, of all ranks, seemed to share the view that women were unfit for [the position at issue]," including remarks from the regional vice president and other managers that included not thinking a girl should have the position, that they were more injury-prone, that this is not a woman's place, that the

---

[6] Meisner also appears to argue that this evidence proves harassment, which is more fully addressed below. See infra Section C.3.



company did not really have women in that position, and that the plaintiff was passed over because of a decision that the company could not have a woman in that position). Nor does Meisner's evidence consist of "evidence that clearly indicates a discriminatory attitude at the workplace and . . . illustrate[s] a nexus between that negative attitude and the employment action." Lettieri v. Equant Inc., 478 F.3d 640, 649 (4th Cir. 2007) (alterations in original) (internal quotation marks and citation omitted). Therefore, the court finds that Meisner has failed to point to direct evidence of discrimination.

### (ii)    Circumstantial Evidence

Nor can Meisner establish a discrimination claim utilizing the McDonnell Douglas framework because, even assuming without deciding that Meisner could establish a *prima facie* case for this claim, the evidence of record does not permit a reasonable inference that ZymoGenetics's reason for terminating Meisner was pretextual.

As an initial matter, the court finds that the defendants have offered a legitimate, nondiscriminatory reason for Meisner's termination. In satisfying this element, ZymoGenetics is not required to persuade the court that the proffered reason for Meisner's termination was the actual motivation for its decision; it "must merely articulate a justification that is 'legally sufficient to justify a judgment' in [its] favor." Mereish v. Walker, 359 F.3d 330, 335 (4th Cir. 2004) (citation omitted) (quoting Burdine, 450 U.S. at 255). The defendants indicate that Fortino and Owens made the decision to terminate Meisner based on her poor relationships with two of her most important accounts, Doctors Hospital and the Medical University of South Carolina, which were consistent with her history of interpersonal conflicts at work, and caused ZymoGenetics to lose faith in her ability to perform her job effectively. This proffered reason appears to be consistent with the evidence of record surrounding Meisner's termination. Specifically, notes in preparation for the



June 29, 2010 meeting, in which Fortino informed Meisner of her termination, indicate that as part of her termination Meisner would be advised that Meisner's approach alienated two of her five largest accounts to the point that they refused to work with her as ZymoGenetics's representative; and that Fortino had previously coached Meisner about her approach and how she can be negatively perceived by the customer.  The notes also state that "[t]he situation has become untenable, and given the size and importance of these accounts, the company has come to the difficult decision that [Meisner's] employment will be ending effective today."  (ECF No. 171-12).  Further, by e-mail dated August 5, 2010 from Sandi Jones (also referred to as Sandi Gray), Meisner was informed that "[i]n summary, your termination of employment was based on a history of interpersonal conflict, most recently manifested by two of your top accounts no longer willing to work with you."  (ECF No. 250-1.)  Similarly, during discovery the defendants indicated that Meisner was terminated based on complaints from two of her most important accounts, MUSC and Doctors Hospital, "that these accounts were not comfortable working with Plaintiff because of her comments and interactions, including a complaint that she was 'stalking' Chris Fortier, the pharmacist at one of her largest accounts, Mr. Fortier would go out the 'back door' to avoid her, and that physicians were complaining of 'being harassed' by Plaintiff."  (ECF No. 250-1.)  The discovery response also identified emails that were produced to Meisner providing more detailed information surrounding the complaints, including identification of the individuals who complained about Meisner and the individuals who reported the complaints to Fortino, some of which have been supplied to the court in connection with the pending motions. (Id.; see also ECF Nos. 250-2, 216-18, & 216-20.)  Finally, the defendants represented that "[t]hese issues reflected very poor relationships with important

accounts, were consistent with Plaintiff's history of interpersonal conflicts at work, and caused [ZymoGenetics] to lose faith in her ability to perform her job effectively."[7]  (ECF No. 250-1.)

As ZymoGenetics has presented a legitimate, nondiscriminatory reason for Meisner's termination, the burden shifts to Meisner to offer evidence that the articulated reason for her termination was pretextual.  From Meisner's filings, the court has construed the following arguments as attempting to establish that the defendants' reason was pretextual.

First, Meisner appears to rely on comparator evidence.  See Laing v. Fed. Express Corp., 703 F.3d 713, 719-20 (4th Cir. 2013) (generally discussing the compelling nature of comparator evidence at the pretext stage of the burden shifting framework).  Generally, to be similarly situated and thus permit a valid comparison, the employees outside the protected class must have dealt with the same decision maker, been subject to the same standards, and engaged in the same conduct without mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.  Mitchell v. Toledo Hosp., 964 F.2d 577, 583 (6th Cir. 1992) (Title VII & ADEA) (defining "similarly situated");[8] see also McGuinness v. Lincoln Hall, 263 F.3d 49, 53-54 (2d Cir. 2001) (emphasizing that an employee must be similarly situated in all material respects); Haywood v. Locke, 387 F. App'x 355, 359 (4th Cir. 2010) (stating that "plaintiffs are required to show that they are similar in all relevant respects to their comparator").  In support of her claim, Meisner

---

[7] To the extent that the defendants' motion may be construed as including any additional reasons for Meisner's termination, the court has limited its McDonnell Douglas analysis to the reasons discussed above as they are the ones offered to Meisner at the time of her termination.

[8] The Fourth Circuit has not issued a published case on this point; however, the following unpublished cases have cited with approval the Mitchell decision:  Atkins v. Holder, 529 F. App'x 318, 321 (4th Cir. 2013); Haywood v. Locke, 387 F. App'x 355, 359 (4th Cir. 2010); Forrest v. Transit Mgmt. of Charlotte, Inc., 245 F. App'x 255 (4th Cir. 2007); Heyward v. Monroe, 166 F.3d 332, 1998 WL 841494, at *2 (4th Cir. 1998); Edwards v. Newport News Shipbuilding & Dry Dock Co., 166 F.3d 1208, 1998 WL 841567, at *3 (4th Cir. 1998).



presents several comparators outside her protected class that she claims engaged in similar conduct but were not terminated. ZymoGenetics argues that the conduct and/or supervisors of each of these employees is distinguishable from Meisner's, precluding them from serving as viable comparators for Title VII purposes.

Upon review of the proposed comparators and the scant evidence provided about each of them,[9] the court finds that the evidence of record does not support many of the assertions made by Meisner in her response brief. For example, the record does not support her assertions that either Comparator #1 (Dana Turley) or #3 (Michael Covington) was removed from any account because persons connected with an account refused to work with them. (See Pl.'s Mem. Opp'n Summ. J., Exs. A & C, ECF Nos. 249-12 & 249-13). Moreover, the majority of the conduct alleged by Meisner in support of Covington as a comparator appears to have occurred in 2008 and 2009, under supervisors other than Owens or Fortino, and is unlike any of the conduct offered as a basis for Meisner's termination. (See ECF No. 249-13). With regard to Comparator #2 (Jeff Bassell), Bassell's deposition testimony indicates that he was removed from an account because the pharmacy director for a particular hospital did not want to convert to ZymoGenetics's product, and the director called Owens to inform him that she did not want Bassell to solicit that hospital any longer. (Bassell Dep. 83:6-10, ECF No. 228-4 at 22.) However, this testimony is insufficient to reveal that Bassell and Meisner engaged in the same conduct without mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it. The undisputed evidence in the record simply reflects that the hospital did not want to convert to ZymoGenetics's product as the basis for

---

[9] Contrary to Meisner's representations in her response brief, she did not submit the exhibit footnoted in conjunction with Comparator #2. (ECF No. 228 at 9.) However, Comparator #2 appears to be Jeff Bassell, and the court is able to glean some information regarding his employment with ZymoGenetics from excerpts submitted from his deposition.



Bassell's ceasing to service that account, not that his conduct or sales approach had alienated the account to the point that it refused to work with Bassell, specifically, as ZymoGenetics's representative. Therefore, the court finds that Meisner has failed to point to a viable comparator to demonstrate pretext.

Meisner's filings may also be construed to argue that ZymoGenetics's reasons were pretextual based on Bassell's testimony purportedly reflecting that ZymoGenetics did not fire sales representatives for being "kicked out of accounts," and that Meisner was the first employee with ZymoGenetics that he had heard of being terminated for "being kicked out of an account." (See Bassell Dep. 98-99, ECF No. 228-4 at 24-25.) However, Meisner has failed to show how a co-worker's statement that she was the only employee terminated on this basis demonstrates that ZymoGenetics's reason for terminating her was unworthy of credence, as Meisner has pointed to no other employee who had persons connected with an account refuse to work with them.[10]

Meisner also appears to attempt to establish pretext based on a 2008 performance review under her prior supervisor, her 2010 sales ranking, and purported accolades from prior employment. (Pl.'s Mem. Opp'n Summ. J. at 4, ECF No. 228 at 4.) She further submits two affidavits from individuals who speak highly of their interactions with Meisner at some point during her employment with ZymoGenetics. (See Travis Decl., ECF No. 228-6; Herbst Decl., ECF No. 228-7.) However, she presents no evidence suggesting that the decision makers did not genuinely believe Meisner had received complaints or reports of very poor relationships with important accounts and interpersonal conflicts or that the actions by the decision makers were motivated by Meisner's

---

[10] Dana Turley is the closest proffered comparator, as the record indicates that he had displeased a hospital with his communication tactics and by providing inaccurate information about their product decision. However, contrary to Meisner's customers, nothing in the record indicates that the hospital perceived the situation to be so egregious that it refused to work with Turley anymore. This mitigating factor materially distinguishes Turley from Meisner.



gender.  See Thornley v. Penton Pub, Inc., 104 F.3d 26, 30 (2d Cir. 1997) ("[I]f the employer's standards are held in good faith, they cannot be the basis of a finding of prohibited discrimination merely because other employers have less exacting standards or because the jury believes the standards to be unreasonable.").

Importantly, Meisner appears to argue at length that several of the reports of alleged misconduct or indications that accounts did not want to work with her either stemmed from various misunderstandings or were allegedly falsely reported; however, Meisner presents no evidence tending to show that the decision makers did not believe that the incidents leading up to Meisner's removal from her two largest accounts, and ultimately her termination, occurred.  See Holland v. Washington Homes, Inc., 487 F.3d 208, 217-18 (4th Cir. 2007) (concluding that no reasonable juror could conclude the decision maker's reason was pretextual where the plaintiff's evidence "failed to address whether [the decision maker] did not honestly believe that the threats were made").

Accordingly, based on all of the foregoing, Meisner cannot show on the record before the court a reasonable inference that ZymoGenetics's reason for terminating Meisner was pretextual.

Finally, even if Meisner's evidence were found sufficient to establish a *prima facie* case and to reject the defendant's explanation, the court concludes that based on the evidence before the court, no reasonable jury could conclude that her termination was discriminatory.[11]  See Reeves, 530

---

[11] The court observes that Meisner herself has offered a different explanation for her removal from two key accounts:  that she challenged the legality of a sales promotion and pricing incentive that Fortino wanted to offer to MUSC and Doctors Hospital.  (See Pl.'s Sur-Reply Opp'n Summ. J. at 15, ECF No. 228 at 15.)  To the extent she attributes her termination to this alleged violation of public policy, she has undermined her claim that her termination was based on a protected characteristic.  See Lightner v. City of Wilmington, N.C., 545 F.3d 260, 263-64 (4th Cir. 2008) (finding that a plaintiff's repeated admission during litigation that the real reason for his suspension was to cover up department wrongdoing wholly undermined plaintiff's claim of race or gender discrimination under Title VII and noting that in offering such explanation as to the real reason for the adverse action, "the plaintiff has undone his case").



U.S. at 148. Meisner cannot ultimately prove that she was the victim of intentional discrimination. See Merritt, 601 F.3d at 294-95.

### b. Religious Discrimination

"To establish a prima facie case of discrimination under Title VII, Plaintiff must show (1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) that similarly situated employees outside the protected class received more favorable treatment." Muhammad v. Westinghouse Elec. Co. LLC, C/A No. 3:12-cv-3298-JFA, 2013 WL 5469982, at *12 (D.S.C. Sept. 30, 2013) (citing White v. BFI Waste Servs., LLC, 375 F.3d 288, 295 (4th Cir. 2004); Booth v. Md., 337 F. App'x 301, 308-09 (4th Cir. 2009)). Meisner's claim of religious discrimination appears to be based on her allegation that during a company event at a comedy club on January 12, 2010 Amy Maxwell, another surgical sales manager in the Southeast region, interrupted her and grabbed her arm while she was expressing her concern to the "Christian" comedian over one of his comments. Meisner alleges that during her conversation with Maxwell, she asked Maxwell if she was Jewish, which Meisner states apparently offended Maxwell. (See Pl. Dep. 231, 245, ECF No. 216-5 at 38, 43; but see Maxwell Dep. 18, ECF No. 216-15 at 4 (testifying that Meisner said to Maxwell in a disdainful tone, "When I met you, I said to myself, oh great, Jeff hired a Jew.")). Meisner alleges that she was later issued a reprimand for her behavior that night while Maxwell (who is, in fact, not Jewish) was not.[12] (See "Expectations Related to Your Conduct," ECF No. 216-5 at 74-76) (Memorandum from Fortino to Meisner summarizing their discussions regarding her alleged comments and behavior at the regional meeting related to

---

[12] In addition to Maxwell's alleged actions interrupting Meisner, Meisner argues that Maxwell should have been reprimanded for singing a portion of a rap song "with very graphic sexual lyrics that denigrated women" during a company-sponsored dinner the night before. (ECF No. 228 at 11.)



"[m]aking statements to or asking questions of a co-worker that were perceived to be derogatory and inappropriate for the business environment" and "[a]ppearing to have over consumed alcohol and being overly intoxicated").

Meisner's allegations relating to this incident completely fail to satisfy the *prima facie* case for religious discrimination. Importantly, the court observes that the "reprimand" under the facts of this case is not sufficient to establish an adverse employment action. See Holland v. Washington Homes, Inc., 487 F.3d 208, 219 (4th Cir. 2007) ("An adverse employment action is a discriminatory act that adversely affect[s] the terms, conditions, or benefits of the plaintiff's employment.") (internal quotation marks and citation omitted); Thorn v. Sebelius, 766 F. Supp. 2d 585, 598, (D. Md. 2011) (finding a letter of counseling that "cautioned that discipline could follow if inadequate performance did not improve and provided constructive criticism" was "akin to a poor performance review or reprimand, both of which are generally not adverse actions"). Moreover, to the extent that Meisner is arguing that this reprimand led to her termination, the record belies that argument. Although Meisner attempts to show this by pointing to a declaration from an individual who interviewed for a job with ZymoGenetics, the declaration merely reflects the hearsay statements provided by another ZymoGenetics surgical sales manager on why he believed Meisner was terminated. (Pl.'s Resp. Opp'n Summ. J., ECF No. 228 at 12) (citing Angermeier Decl. ¶¶ 5-8, ECF No. 246-1 at 2-3). Additionally, Meisner has failed to point to any similarly situated employee outside the protected class who engaged in comparably serious conduct but received more favorable treatment; in fact, Meisner has failed to even suggest a comparator outside of her protected class, which, although she fails to expressly identify it, appears to be Christian. (See Pl. Dep. 243, ECF No. 216-5 at 42); Mitchell, 964 F.2d at 583. Therefore, the defendants are entitled to summary judgment on this claim.

### c.    Harassment/Hostile Work Environment

Title VII prohibits creating or allowing a hostile work environment based on race, color, religion, sex, or national origin.  See Baqir v. Principi, 434 F.3d 733, 746 n.14 (4th Cir. 2006).  Such an environment exists "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or persuasive to alter the conditions of the victim's employment and create an abusive working environment."  Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993) (internal quotation marks & citations omitted) (Title VII).  However, "[w]orkplaces are not always harmonious locales."  E.E.O.C. v. Sunbelt Rentals, Inc., 521 F.3d 306, 315-16 (4th Cir. 2008) (Title VII).  Moreover, federal employment statutes are not "general civility code[s]." Oncale v. Sundower Offshore Servs., Inc., 523 U.S. 75, 80 (1998) (Title VII); Shirer v. Tri-County Elec. Co-op., Inc., C/A No. 5:07-1156-MBS, 2009 WL 2900767, at *8 (D.S.C. Sept. 9, 2009) (Title VII & ADEA).

To make out a hostile work environment claim under federal anti-discrimination laws, a plaintiff must show that "(1) [s]he experienced unwelcome harassment; (2) the harassment was based on [her] race, color, religion, national origin, or age; (3) the harassment was sufficiently severe or pervasive to alter the conditions of [her] employment and to create an abusive atmosphere; and (4) there is some basis for imposing liability on the employer."  Baqir, 434 F.3d at 745-46.

To meet the second element, a plaintiff must show that "but for" one of these protected traits, she would not have been a victim of harassment.  See Causey v. Balog, 162 F.3d 795, 801 (4th Cir. 1998) (Title VII & ADEA).  The federal anti-discrimination statutes do not protect employees from hostility and abuse from their supervisors unless the objectionable conditions occur because of a protected characteristic.  See Graham v. Prince George's Cnty., 191 F. App'x 202, 204 (4th Cir. 2006) (finding the district court did not err in determining that "although [the] facts reflected an



unpleasant working environment, they did not support a hostile one based on an unlawful characteristic"); <u>see</u> <u>also</u> <u>Oncale</u>, 523 U.S. at 80; <u>Shirer</u>, 2009 WL 2900767, at *8.

Moreover, in a hostile work environment case, the behavior must rise to the standard of being so "severe" or "pervasive" so as to create an abusive working environment. <u>Harris</u>, 510 U.S. at 21; <u>see</u> <u>also</u> <u>Baqir</u>, 434 F.3d at 746. When analyzing this element, courts examine the totality of the circumstances, considering such factors as the frequency of the discriminatory conduct and its severity; whether it is physically threatening or humiliating or merely constitutes offensive verbal statements; and whether it unreasonably interferes with an employee's work performance. <u>See</u> <u>Harris</u>, 510 U.S. at 23; <u>Hopkins v. Baltimore Gas & Elec. Co.</u>, 77 F.3d 745, 753 (4th Cir. 1996); <u>see</u> <u>also</u> <u>Sunbelt Rentals, Inc.</u>, 521 F.3d at 315-16 (stating that complaints that would objectively give rise to bruised or wounded feelings or incidents that are premised on nothing more than rude treatment, callous behavior, or a routine difference of opinion and personality conflict will not satisfy the severe or pervasive standard).

Here, Meisner cannot show that any alleged harassment was (1) based upon a protected characteristic; or (2) sufficiently severe and pervasive so as to create an abusive working environment. In her Amended Complaint, Meisner appears to allege that ZymoGenetics subjected her to a hostile work environment based on Fortino's remarks to her and by requiring her to attend a function that she perceived to belittle her religion. Meisner's sole argument in her response in opposition to the defendant's motion for summary judgment appears to be that Maxwell harassed her at the comedy club by interrupting her and grabbing her arm. In addressing this claim in her sur-reply, Meisner appears to primarily rely on the same evidence that she presents in support of her

disparate treatment claim.[13]  See supra Section C.1.a; (ECF No. 246 at 2).  In addition, she also appears to rely on the following:

- Fortino directing the question "Hello, McFly, are you there?" to her during conference calls (Pl. Dep. 210:8-11, ECF No. 246-2 at 9);

- Fortino asking "Rhonda, do you have anything to say?" at the end of a conference but not asking anyone else (id. at 210:18-20, ECF No. 246-2 at 9); and

- After stating that there was a problem with the router or internet service, Fortino stated that she did not know how to use it and when he tried to fix her computer he agreed that it was not working (id. at 212, ECF No. 246-2 at 11).

(ECF No. 246 at 2.)  The court finds that these alleged incidents, taken as true, are insufficient as a matter of law to support a hostile work environment claim.[14]  They fail to establish that any alleged harassment was severe and pervasive, as they are sporadic and isolated, and, in any event, do not appear to be overtly offensive based on gender or religion.  See Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998) (stating that "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment") (internal quotation marks and citations omitted); compare E.E.O.C. v. Central Wholesalers, Inc., 573 F.3d 167, 176 (4th Cir. 2009) (finding alleged gender-based and race-based harassment was sufficiently severe or pervasive where co-workers referred to women as b* * *hes and a co-worker in a cubicle next to the plaintiff had Playboy items, watched pornography in front

---

[13] She also appears to argue that the allegations in support of her claim of slander support a her hostile work environment claim.

[14] Meisner's testimony also appears to contradict her arguments that Fortino treated Meisner differently than similarly situated males in meetings and events.  In an apparent attempt to paint Fortino as racist as well as sexist, Meisner also testified that at least one male, who is African American, was similarly mistreated by Fortino.  (Pl. Dep. 211-13, ECF No. 216-5 at 31-33.) The testimony that Fortino treated a similarly situated male in the same allegedly selective manner undercuts her theory, however, that it was Meisner's gender that caused Fortino to treat her differently.  See Causey, 162 F.3d at 801 (requiring plaintiff to show that "but for" one of the protected traits, she would not have been a victim of harassment).



of her, had a pornographic screensaver, and placed a screwdriver in a Halloween decoration in a sexual manner and where co-workers used racial epithets, some directed at the plaintiff, and two co-workers "kept blue-colored mop-head dolls in their offices which they had hanging by nooses tied around the dolls' necks") and Spriggs v. Diamond Auto Glass, 242 F.3d 179 (4th Cir. 2001) (holding that supervisor's constant, even daily, use of racial epithets was sufficiently severe or pervasive to survive summary judgment) and Smith v. First Union Nat'l Bank, 202 F.3d 234 (4th Cir. 2000) (concluding that "a barrage of threats and gender-based insults" that the plaintiff's supervisor directed at her and that occurred more than thirty times in the first few weeks of the plaintiff's employment was sufficiently severe or pervasive to survive summary judgment) and Amirmokri v. Baltimore Gas & Elec. Co., 60 F.3d 1126, 1131 (4th Cir. 1995) (finding the alleged harassment was sufficiently severe or pervasive because an Iranian plaintiff was called "names like 'the local terrorist,' a 'camel jockey' and 'the Emir of Waldorf' " on an almost daily basis) with McNeal v. Montgomery Cnty., Md., 307 F. App'x 766, 776 (4th Cir. 2009) (stating that "five accusations of theft and [the supervisor's] requirement that [the plaintiff] bring in doctor's notes and provide for more detail about his sick leave hardly rise to the level of 'hostile or abusive' treatment") and Hopkins, 77 F.3d 745 (acknowledging that the conduct and sexual comments at issue were "inappropriately forward," but finding the alleged harassment was insufficiently severe or pervasive where the conduct occurred over several years, most sexual comments and conduct occurred in group settings, and the supervisor never "made an overt sexual proposition or touched [the plaintiff] in a sexual manner").  The incidents identified by Meisner are insufficient to show that her workplace was permeated with discriminatory intimidation, ridicule, and insult that were sufficiently severe or persuasive to alter the conditions of the victim's employment and create an abusive working environment based on her religion or gender.  See Harris, 510 U.S. at 23.



### d.     Failure to Promote/Performance Review

The defendants have aptly addressed any claim Meisner may be alleging regarding a failure to promote, which Meisner fails to address or otherwise respond to in her response opposing the defendants' motion for summary judgment. Although Meisner briefly mentions one of these instances in her sur-reply (ECF No. 246 at 3), Meisner appears to have abandoned these claims. To the extent that she has not, the court finds her summary challenge to the defendants' supported assertion that the male selected for the field sales trainer position was more qualified than her to be unsupported. Accordingly, the court finds for the reasons discussed in the defendants' memorandum, they are entitled to summary judgment on these claims. (See ECF No. 216-1 at 21-24.)

Similarly, for the reasons argued by the defendants, summary judgment is warranted on any alleged independent claim related to a discriminatory evaluation by Fortino for 2009. (See id. at 24-25.) Moreover, Meisner has not challenged this argument and therefore appears to have abandoned such a claim.

### e.     Age Discrimination

To obtain relief based upon alleged age discrimination under the ADEA, a plaintiff must demonstrate that: (1) she is a member of a protected class; (2) she suffered an adverse employment action; (3) at the time of the adverse employment action, she was performing her job at the level that met the employer's legitimate expectations; and (4) she was discharged under circumstances that raise a reasonable inference of unlawful discrimination.[15] See O'Connor v. Consol. Coin Caterers

---

[15] The court notes that the United States Supreme Court has held that to prevail on an ADEA claim, a plaintiff must show that age was the "but for" cause of the adverse action of the employer. Gross v. FBL Fin. Servs., Inc., 557 U.S. 167, 176 (2009) ("To establish a disparate-treatment claim under the plain language of the ADEA . . . a plaintiff must prove that age was the 'but-for' cause of the employer's adverse decision.").



Corp., 517 U.S. 308, 310-12 (1996) (discussing the *prima facie* case under the ADEA); see also Warch v. Ohio Cas. Ins. Co., 435 F.3d 510 (4th Cir. 2006). Although she points out that she was over the age of forty when she was terminated and mentions in her sur-reply that she was replaced by a younger, single female six months after her termination who was hired by a different hiring manager, Meisner has failed to show that her termination occurred under circumstances raising an inference of unlawful age discrimination and that it was the "but for" cause of her termination.[16] Similarly, for the reasons discussed above, Meisner cannot demonstrate that the defendants' legitimate non-discriminatory reasons were pretext for unlawful age discrimination. Accordingly, Meisner's age discrimination claim fails as a matter of law.

### f. Retaliation

Title VII makes it unlawful for an employer to retaliate against an employee for engaging in activity protected by the statute. See 42 U.S.C. § 2000e-3(a). Generally, the requisite elements for a *prima facie* case of retaliation typically include: (1) she engaged in a protected activity; (2) the employer acted adversely against her; and (3) there was a causal connection between the protected activity and the asserted adverse action. Ziskie v. Mineta, 547 F.3d 220, 229 (4th Cir. 2008); Holland v. Washington Homes, Inc., 487 F.3d 208, 218 (4th Cir. 2007). The defendants argue that there is no evidence of a causal connection and note that Meisner cannot establish that she engaged in a protected activity; therefore, they contend, Meisner cannot establish a *prima facie* case of retaliation.

---

[16] In further support of this conclusion, the defendants point out that when asked in her deposition for the basis for her age discrimination claim, Meisner responded that the agency investigator at the South Carolina Human Affairs Commission told her to include that claim because of her age. (Def.'s Mem. Supp. Summ. J. at 32, ECF No. 216-1 at 32) (citing Pl. Dep. 342-43).



To prove a causal connection, a plaintiff asserting a retaliation claim must be able to show that her employer took the adverse action " '*because* the plaintiff engaged in a protected activity.' " Holland, 487 F.3d at 218 (emphasis in original) (quoting Dowe v. Total Action Against Poverty in Roanoake Valley, 145 F.3d 653, 657 (4th Cir. 1998)).  Thus, to demonstrate causation, a plaintiff must show that the employer was aware of the protected activity.  See Shield v. Fed. Express Corp., 120 F. App'x 956, 962 (4th Cir. 2005) (citing Luckie v. Ameritech Corp., 389 F.3d 708, 715 (7th Cir. 2004)).  In certain circumstances, temporal proximity between the protected activity and the adverse action can be probative of a causal connection.  See Clark Cnty. Sch. Dist. v. Breeden, 532 U.S. 268, 273-74 (2001) (noting that to establish a causal connection based on temporal proximity alone, the time between the employer's knowledge of the protected activity and the adverse employment action must be "very close" and holding a twenty-month period to be insufficient).  Further, "Title VII retaliation claims must be proved according to traditional principles of but-for causation," which "requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer."  Univ. of Tex. Sw. Med. Ctr. v. Nassar, 133 S. Ct. 2517, 2533 (2013).

In this case, the alleged protected activity consists of Meisner's reports in November 2007 to Valerie Darling (her former supervisor) and Calderazzo that she "felt the females in the company should call on the physicians associated with the Burn Unit together or with another rep present." (Pl. Dep. 153:2-4, ECF No. 216-5 at 15.)  During her deposition, Meisner stated that she made this request because during her first meeting with Dr. Brandigi in October 2007, he continued to speak of ZymoGenetics's stock and called his stockbroker in her presence despite her mentioning that she did not want to keep the patients in the waiting room and the nurses waiting on him.  (Id. at 153-155, ECF No. 216-5 at 15-17.)  She also testified that Dr. Friedman told her he was trying to pick her up

following dinner the night before.  (Id. at 155-56, ECF No. 216-5 at 17-18.)  Meisner reported that

Darling resolved the situation by granting her request.[17]  (Id. at 160, ECF No. 216-5 at 20.)

Even assuming that in this circuit complaining of harassment by third parties constitutes

protected activity[18] and that Meisner and ZymoGenetics could have reasonably believed her reports

to constitute protected activity, Meisner cannot show a causal connection between her reports to

Darling in 2007 and 2008[19] and her reprimand by Fortino in January 2010.  Similarly, she cannot

show a causal connection between her reports and her termination in August 2010.  See Holland,

---

[17] Meisner also appears to allege that she subsequently reported to Darling that Dr. Brandigi made her uncomfortable in 2008 when she and a male surgical sales manager, Turley, attempted to call on Brandigi.  After waiting for Brandigi for two hours Meisner and Turley left in separate vehicles.  As Meisner was leaving the parking lot, Brandigi called inquiring whether she had left and asked if she would return to speak with him for a minute.  Meisner agreed and met with him in the parking lot, at which time Brandigi gave her the "pricing for Doctors Hospital" but declined Meisner's offer to have Turley follow up with him, essentially stating that he could not help them in their efforts to get Doctors Hospital to switch to Recothrom.  (Meisner Dep. 157-58, ECF No. 228-1 at 22-23.)  She also reported "a little later" that Brandigi approached her at a burn meeting, he looked at her pregnant belly and said, "Your stock sucks."  (Id. at 158, ECF No. 228-1 at 23.)

[18] See Beckford v. Dep't of Corr., 605 F.3d 951, 957-58 (11th Cir. 2010) (stating that "[i]t is well established that employers may be liable for failing to remedy the harassment of employees by third parties who create a hostile work environment" and collecting cases); Dunn v. Wash. Cnty. Hosp., 429 F.3d 689, 691 (7th Cir. 2005) ("Because liability is direct rather than derivative, it makes no difference whether the person whose acts are complained of is an employee, an independent contractor, or for that matter a customer.  Ability to 'control' the actor plays no role.") (Easterbrook, J.).

[19] Contrary to Meisner's assertions, the record does not contain evidence showing that Fortino or Owens knew the details behind her reports to Darling and Calderazzo about the physicians.  Meisner has presented no evidence showing that Fortino had been told anything beyond the fact that Meisner had "relationship issues" or "personal issues" with Dr. Brandigi.  (Compare Pl.'s Resp. Opp'n Summ. J. at 8, ECF No. 228 at 8 with Meisner's Dep. 318, ECF No. 216-5 at 60); see also Shield, 120 F. App'x at 962 (stating that for a causal connection to exist the employer must be aware of the protected activity); Burgess v. Bowen, 466 F. App'x 272, 282 (4th Cir. 2012) (observing that "an employee's complaint constitutes protected activity when the employer understood, or should have understood, that the plaintiff was opposing discriminatory conduct," which "requires courts to consider whether the complaint could reasonably have led the employer to understand the nature of the complaint in the context in which it was made") (citations omitted).



487 F.3d at 218; see also Clark Cnty. Sch. Dist., 532 U.S. at 273-74 (finding a twenty-month period to be insufficient to establish a causal connection based on temporal proximity alone); Pascual v. Lowe's Home Ctrs., Inc., 193 F. App'x 229 (4th Cir. 2006) (*per curiam*) (holding that the plaintiff had failed to establish a causal connection by temporal proximity alone when "at least three to four months" separated the claimed protected activities and the termination of the plaintiff's employment). Much less can she show that but for her reports to Darling and Calderazzo, she would not have been reprimanded or terminated. See Nassar, 133 S. Ct. at 2533; Holland, 487 F.3d at 218. Further, for all the reasons stated above, she cannot show that ZymoGenetics's proffered reason for her termination was a pretext for unlawful retaliation. Therefore, her claim must fail.

## C.    Slander Claim

Meisner also raises a claim of slander based on allegations that Defendant Calderazzo told Carol Murphy, Rebecca Lewis, and other employees of ZymoGenetics that Meisner had received a citation for or been convicted of driving under the influence (DUI). However, as pointed out by the defendants, the only admissible evidence demonstrating that Calderazzo made the alleged slanderous statements is Murphy's testimony, which indicates that the alleged slander occurred before May 2009. Accordingly, this claim is untimely under the applicable two-year state statute of limitations, S.C. Code Ann. § 15-3-550(1), which runs from publication. See, e.g., White v. Wal-Mart Stores, Inc., C/A No. 3:08-553-CMC, 2008 WL 4186192, at *2 (D.S.C. 2008) ("[I]t seems clear that under South Carolina law, the statute of limitations for defamation begins to run at the time the defamatory statement is made.") (citing Jones v. City of Folly Beach, 483 S.E.2d 770, 774-75 (S.C. Ct. App. 1997) (finding that the "date of utterance rule" and not the "discovery rule" applies in defamation actions)). Accordingly, the defendants are entitled to summary judgment on this claim.



D.    **South Carolina Payment of Wages Act Claim**

Finally, the parties have filed cross-motions for summary judgment on Meisner's claim alleging violation of the South Carolina Payment of Wages Act ("Wages Act"), S.C. Code Ann. § 41-10-10, et seq. Specifically, Meisner alleges that she did not receive incentive pay that she is entitled to from the second period of 2010 (April through July).[20] The defendants maintain that she is not entitled to this money because pursuant to ZymoGenetics's policy, incentive pay was not earned if the employee was not employed on the specified date for payout, which in this case was August 31, 2010. Meisner appears to argue that as of the date of her termination, ZymoGenetics possessed all the information required to determine her incentive pay.[21]

The Wages Act creates a cause of action for an employee against an employer for the employer's failure to pay wages as required by the Act. See S.C. Code Ann. § 41-10-80(C). "[T]he purpose of the [Wages Act] is 'to protect employees from the unjustified and willful retention of wages by the employer.'" Mathis v. Brown & Brown of S.C., Inc., 698 S.E.2d 773, 783 (S.C. 2010) (quoting Rice v. Multimedia, Inc., 456 S.E.2d 381, 383 (S.C. 1995)). Section "41-10-40 generally requires an employer to timely pay all wages due and § 41-10-50 provides that when an employer discharges an employee, it must timely pay [her] all wages due." Mathis, 698 S.E.2d at 781. Wages are defined as

---

[20] In her motion for summary judgment, Meisner also argues that ZymoGenetics failed to pay her matching deposits to her retirement account. However, this claim was raised for the first time in this motion and therefore is not properly before the court. Moreover, even if this claim were included in her Amended Complaint, as cited below, the definition of "wages" specifically states that "[f]unds placed in pension plans or profit sharing plans are not wages subject to this chapter." S.C. Code Ann. § 41-10-10(2).

[21] She appears to alternatively argue that ZymoGenetics should have applied her accrued and unused sick and vacation days to extend her termination date beyond August 31, 2010 thus entitling her to the incentive pay; however, Meisner fails to provide any legal support that ZymoGenetics's failure to take this proposed approach violated the Wages Act.



> all amounts at which labor rendered is recompensed, whether the amount is fixed or ascertained on a time, task, piece, or commission basis, or other method of calculating the amount and includes vacation, holiday, and sick leave payments which are due to an employee under any employer policy or employment contract. Funds placed in pension plans or profit sharing plans are not wages subject to this chapter.

S.C. Code Ann. § 41-10-10(2). Accordingly, the Wages Act "creates a right to be paid wages due based upon an employment contract. The contract is the source of the right to wages for [commission], not the South Carolina statute." Anselmo v. W. Paces Hotel Grp., LLC, C/A No. 9:09-2466-MBS, No. 2011 WL 1049195, at *10 (D.S.C. Mar. 18, 2011) (citations omitted); see also Rice, 456 S.E.2d at 384 (explaining that the employer's "policy establishes the manner in which it will pay sales commissions," and disagreeing with plaintiff's argument that the "policy violates the Wage Payment Act since it determines, by private agreement, what wages are 'due' under the Act"); Baugh v. Columbia Heart Clinic, 738 S.E.2d 480, 495 (S.C. Ct. App. 2013) (holding that the contract between the employer and the employees which included a forfeiture provision was enforceable and controlled whether employees were due the compensation at issue); M. Malissa Burnette, et al., Labor and Employment Law for South Carolina Lawyers 226 (4th ed. 2011) ("Many employers have policies providing that benefits . . . will be forfeited under certain conditions when an employee is separated. There are no prohibitions against such policies . . . . Therefore, the policies of the employer will control.").

In this case, ZymoGenetics 2010 Sales Incentive Plan provides, "Field Sales Force members must be employed by ZymoGenetics at the time the payment is made to receive an incentive payment for any SIP period." (Ex. G, Def.'s Resp. Opp'n Summ. J., ECF No. 154-7.) The Plan specifically lists each date on which incentive payments will be made for relevant year, including August 31, 2010. (Id. at 11.) Meisner was not employed on August 31, 2010, and therefore, according to ZymoGenetics 2010 Sales Incentive Plan was not eligible for the August 31, 2010



incentive payment. Therefore, pursuant to ZymoGenetics's policy there were no additional incentive wages due to Meisner under the Wages Act. See Baugh, 738 S.E.2d at 493-95 (holding that the earned but unpaid salary was not due to the plaintiffs pursuant to their employment agreement, which provided that all "salary earned or accrued but unpaid as of the date of termination" was forfeited under specified circumstances existing in this case, and, consequently, there were no "wages" that were "due" to the plaintiffs under the Wages Act); Rice, 456 S.E.2d at 382-84 (finding no violation of the Wages Act where the employer refused to pay the departing employee sales commission on seven contracts since the advertisements had not been broadcast pursuant to the employee handbook's provision that "sales commissions would be paid to a departing employee only for those advertisements sold by the employee and *actually broadcast* through the end of the month in which the employee worked his last day") (emphasis in original).

Meisner argues that the decision of the South Carolina Court of Appeals in Ross v. Ligand Pharmaceuticals, Inc., 639 S.E.2d 460 (S.C. Ct. App. 2006), supports her claim. However, Ross is distinguishable from this case. In Ross, the court affirmed the trial court's holding that the employer violated § 41-10-40(D)'s requirement that "[e]very employer in the State shall pay all wages due at the time and place designated as required by subsection (A) of § 41-10-30"[22] by failing to provide the employee with the time that wages earned and due under the plan would be paid. The incentive plan at issue in Ross provided that for an employee "to be eligible for the trimester incentive

---

[22] Section 41-10-30(A) provides:
Every employer shall notify each employee in writing at the time of hiring of the normal hours and wages agreed upon, the time and place of payment, and the deductions which will be made from the wages, including payments to insurance programs. The employer has the option of giving written notification by posting the terms conspicuously at or near the place of work. Any changes in these terms must be made in writing at least seven calendar days before they become effective. This section does not apply to wage increases.



compensation payout, [an employee] must be employed at the time the trimester sales incentive compensation payouts are distributed." Ross, 639 S.E.2d at 462. Additionally, the regional business managers plan that also applied to Ross during the time at issue provided that the incentive plan payout would be paid on a listed "estimated schedule," which were described as "target dates." Id. Ross resigned from employment after the target date for the second trimester payment but before it was actually issued and the employer did not pay the plaintiff his second trimester incentive payout because he was not employed at the time of the payout. The Court of Appeals found that the employer

> provided employees with no time certain for when payment would occur. [The employer] admitted the key to receiving the earned bonus was the date it arbitrarily selected for distribution of the checks not the "target dates" from the estimated schedule provided to [the plaintiff]. Providing estimated payment dates that serve "no purpose whatsoever" and are dependent upon employees being employed at the time payouts are distributed, whenever that may be, clearly does not provide notice of "time and date of payment."

Id. at 463. The Court of Appeals therefore affirmed the trial court's finding that the employer violated § 41-10-40 as "the failure to provide the time and place of payment prevented Ligand from being able to pay wages due to Ross at the time and place designated as mandated by section 40-10-40(D)." Id. at 471.

The facts in Ross are not present in this case. In Ross the employer essentially was not following its own incentive plan and failed to pay on the target dates. Here, the only evidence reveals that all incentive payments (save one that was paid early due to a federal holiday) made to surgical sales managers from 2008 until the end of Meisner's employment in 2010 were consistent with the payment dates specified in the Sales Incentive Plan. (Schwartz Decl. ¶ 11, ECF No. 154-1 at 5.) Thus, there is no evidence from which a finding could be made that ZymoGenetics's Sales

Incentive Plan violated § 40-10-40(D) or that ZymoGenetics otherwise violated the Wages Act. Therefore, the defendants are entitled to summary judgment on this claim.

### E.    Other Claims

To the extent that Meisner's response or sur-reply to the defendants' motion for summary judgment may be construed as attempting to raise additional claims, the court finds that these claims are not properly before the court.  See, e.g., Bridgeport Music, Inc. v. WM Music Corp., 508 F.3d 394, 400 (6th Cir. 2007) (holding that a party may not expand its claims to assert new theories in response to summary judgment); White v. Roche Biomedical Labs., Inc., 807 F. Supp. 1212, 1216 (D.S.C. 1992) (noting that "a party is generally not permitted to raise a new claim in response to a motion for summary judgment").

### F.    Sealed Documents

The United States Court of Appeals for the Fourth Circuit has recently discussed the public's right of access to judicial documents and records, and stated that "the First Amendment secures a right of access 'only to particular judicial records and documents,' and, when it applies, access may be restricted only if closure is 'necessitated by a compelling government interest' and the denial of access is 'narrowly tailored to serve that interest.' "  Doe v. Public Citizen, 749 F.3d 246, 266 (4th Cir. 2014) (citations omitted).  Moreover, the Court observed that "summary judgment is an adjudication that 'serves as a substitute for trial,' and therefore, the First Amendment right of access attaches to documents and materials filed in connection with a summary judgment motion."  Id. at 267 (citations omitted).  In considering the parties' summary judgment motions, the court has considered and discussed numerous documents that were previously sealed on motion of the plaintiff without objection by the defendants.  (ECF Nos. 171, 249, & 250.)  Therefore, mindful of the First Amendment's right of access, the court recommends that all of these documents be unsealed unless



either party makes a document specific showing that access should be restricted sufficient to satisfy the First Amendment test.

## RECOMMENDATION

Based on the foregoing, the court recommends that the defendants' motion for summary judgment (ECF No. 216) be granted and Meisner's motion for summary judgment (ECF No. 134) be denied. The court also recommends that all documents filed in connection with the summary judgment motions be unsealed. (ECF Nos. 171, 249, & 250.) In light of this recommendation, the court further recommends that the remaining motions be terminated. (ECF Nos. 204 & 219.)

July 30, 2014
Columbia, South Carolina

Paige J. Gossett
UNITED STATES MAGISTRATE JUDGE

*The parties' attention is directed to the important notice on the next page.*

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge.  Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections.  "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'"  Diamond v. Colonial Life & Acc. Ins. Co., 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); see Fed. R. Civ. P. 6(a), (d).  Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.**  28 U.S.C. § 636(b)(1); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).